```
              UNITED STATES DISTRICT COURT
               DISTRICT OF MASSACHUSETTS
```

SCOTT MULLIN and
ANDREW KEITH,
    Plaintiffs,


   v.                                         CIVIL ACTION NO.
                                            19-11028-MBB

BAYLINE, INC.,
    Defendant.

**MEMORANDUM AND ORDER RE:**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 49)**

**December 7, 2021**

**BOWLER, U.S.M.J.**

    Pending before this court is a motion for summary judgment filed by defendant Bayline, Inc. ("defendant" or "Bayline"). (Docket Entry # 49).  Plaintiffs Scott Mullin ("Mullin") and Andrew Keith ("Keith") (together, "plaintiffs") oppose the motion.  (Docket Entry # 54).  After conducting a hearing on August 2, 2021, this court took the motion under advisement. (Docket Entry # 59).

PROCEDURAL BACKGROUND

    Plaintiffs initiated this admiralty action on May 1, 2019, alleging negligence (Count I), breach of contract (Count II), and breach of the implied warranty of workmanlike performance (Count III).  (Docket Entry # 1, pp. 3-4) (Docket Entry # 16-1, pp. 2-3).  The parties' dispute arises from damage incurred by

Mullin's vessel, M/V Double Trouble (the "Vessel"), after Mullin brought the Vessel to defendant's facility in August 2017 for certain repairs.  See (Docket Entry # 16-1, pp. 1-2). Plaintiffs allege that, after leaving defendant's facility with the Vessel, the port and starboard side engines malfunctioned, requiring immediate assistance from the U.S. Coast Guard. (Docket Entry # 16-1, p. 2).  They further allege that defendant's service of the Vessel caused a "constructive total loss" of the Vessel and that the experience caused them "great mental anguish and other damages that will be shown at trial." (Docket Entry # 16-1, pp. 2-3).  Defendant, in turn, denies responsibility for the incident.  (Docket Entry # 17, p. 3).

On April 1, 2020, plaintiffs' counsel filed a suggestion of death upon the record as to Keith (the "suggestion of death"), pursuant to Fed. R. Civ. P. 25(a)(1) ("Rule 25(a)(1)").  (Docket Entry # 22).  The suggestion of death indicated that Keith died on March 24, 2020 and that counsel for his estate was in the process of setting up the estate.  (Docket Entry # 22).  To date, a motion to substitute another party in place of Keith has not been filed.  Plaintiffs' filings since the suggestion of death, however, have replaced Keith in the caption with "Robert Keith as personal representative of the estate of Andrew Keith." See, e.g., (Docket Entry # 56, p. 1) (capitalization modified).

I.  <u>Defendant's Motion for Summary Judgment</u>

<u>STANDARD OF REVIEW</u>

Summary judgment is designed "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  <u>Tobin v. Federal Express Corp.</u>, 775 F.3d 448, 450 (1st Cir. Dec. 30, 2014) (quoting <u>Wynne v. Tufts Univ. Sch. of Med.</u>, 976 F.2d 791, 794 (1st Cir. 1992)).  It is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  It is inappropriate, in contrast, "if the record is sufficiently open-ended to permit a rational factfinder to resolve a material factual dispute in favor of either side." <u>Pierce v. Cotuit Fire Dist.</u>, 741 F.3d 295, 301 (1st Cir. 2014).

"An issue is 'genuine' when a rational factfinder could resolve it [in] either direction," and a "fact is 'material' when its (non)existence could change a case's outcome."  <u>Mu v. Omni Hotels Mgmt. Corp.</u>, 882 F.3d 1, 5 (1st Cir. 2018); <u>accord</u> <u>Green Mountain Realty Corp. v. Leonard</u>, 750 F.3d 30, 38 (1st Cir. 2014).  The court views the record in favor of the nonmoving party and draws reasonable inferences in that party's favor.  <u>See</u> <u>Garcia-Garcia v. Costco Wholesale Corp.</u>, 878 F.3d 411, 417 (1st Cir. 2017) ("The court must examine the 'record in the light most favorable to the nonmovant' and must make 'all

3

reasonable inferences in that party's favor.'" (quoting Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 68 (1st Cir. 2015))). Courts ignore "'conclusory allegations, improbable inferences, and unsupported speculation.'" Garcia-Garcia, 878 F.3d at 417 (quoting Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009)).

"To succeed in showing that there is no genuine dispute of material fact, the moving party must direct [the court] to specific evidence in the record that would be admissible at trial." Ocasio-Hernandez v. Fortuno-Burset, 777 F.3d 1, 4-5 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file . . . demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir.2000)). "[I]f the summary judgment record satisfactorily demonstrates that the plaintiff's case is, and may be expected to remain, deficient in vital evidentiary support, this may suffice to show that the movant has met its initial burden." Carmona, 215 F.3d at 133. In addition, "where expert testimony is required to support the non-moving party's case, and there is an absence of such testimony, summary judgment is appropriate." Cousins v. Higgins, No. 18-1832, 2019 WL 11234276, at *1 (1st Cir. Aug. 13,

4

2019) (citing Flanders & Medeiros, Inc. v. Bogosian, 65 F.3d 198, 206 (1st Cir. 1995)).

Uncontroverted statements of fact in a L.R. 56.1 statement of material facts comprise part of the summary judgment record. See L.R. 56.1; Cochran v. Quest Software, Inc., 328 F.3d 1, 12 (1st Cir. 2003) (admitting a date on summary judgment because plaintiff failed to contest date in L.R. 56.1 statement); Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003) (citing L.R. 56.1 and admitting undisputed material facts that plaintiff failed to controvert).  The parties in this case have each filed a L.R. 56.1 statement of material facts. (Docket Entry ## 49-1, 56).  Plaintiffs also filed an opposition to defendant's L.R. 56.1 statement of material facts.  (Docket Entry # 55).

## FACTUAL BACKGROUND[1]

On August 7, 2017, Mullin took the Vessel to defendant's facility in New Bedford, Massachusetts for replacement of the port side engine and the exhaust manifolds and risers on both engines (port and starboard).  (Docket Entry # 56-1, p. 1) (Docket Entry # 56-4, p. 2, ¶ 12).  The Vessel was equipped with two bilge pumps (one in the bow and the other amidships forward

---

[1] In adjudicating defendant's motion for summary judgment, this court reviewed the entire summary judgment record.  Any failure to recite certain parts of the record does not mean this court did not consider them.

5

of the engines) that contained automatic switches.[2]  (Docket Entry # 49-1, p. 1, ¶¶ 1, 3) (Docket Entry # 55, pp. 1-2, ¶¶ 1, 3) (Docket Entry # 56, p. 2, ¶ 14) (Docket Entry # 56-4, p. 3, ¶ 39).

After installing the risers, defendant conducted a sea trial for one hour.  (Docket Entry # 56-1, p. 7) (Docket Entry # 56-4, p. 2, ¶ 15).  Mullin then requested the installation of lower risers.  (Docket Entry # 56-3, p. 2) (Docket Entry # 56-4, p. 2, ¶ 15).  Defendant did not conduct another sea trial after replacing the risers.  (Docket Entry # 56-4, p. 2, ¶ 19).

On the morning plaintiffs arrived to retrieve the Vessel, a small crafts warning had been issued for noon that day.  (Docket Entry # 56-4, p. 2, ¶¶ 21-23).  The Vessel "was supposed to be

---

[2]  Defendant alleges that one pump had a capacity of 1300 gallons per hour and the other had a capacity of 1100 gallons per hour (together providing a capacity of "2400 gallons per hour in the aggregate").  (Docket Entry # 49-1, p. 1, ¶ 1); see (Docket Entry # 49-2, p. 4, ¶ 10).  Defendant also alleges that, because of the automatic switches, the operation of the bilge pumps "would have been triggered by any significant accumulation of water in the bilges of the Vessel."  (Docket Entry # 49-1, p. 1, ¶¶ 1, 3); see (Docket Entry # 49-2, p. 4, ¶ 10).  Plaintiff denies both allegations, instead pointing to testimony from Mullin "that the pumps would not remove water while the [V]essel was underway because of their locations.  One was in the bow area and the other was amidships forward of the engines.  Water would accumulate in the aft section of the [V]essel while underway."  (Docket Entry # 55, p. 1, ¶ 1); see (Docket Entry # 55-1, pp. 2-4).  The record is construed in plaintiffs' favor.  See Jones v. City of Boston, 845 F.3d 28, 32 (1st Cir. 2016) (recognizing requirement to resolve disputed facts in non-moving parties' favor).

in the water, ready to go at 7:30" a.m.   (Docket Entry # 56-2, p. 4).   Plaintiffs arrived at defendant's facility at 8:30 a.m. and left with the Vessel between 10:15 and 11:00 a.m.   (Docket Entry # 56-4, p. 4).   The trip home to Westport, Massachusetts would take approximately one hour to one hour and twenty minutes.   (Docket Entry # 56-2, p. 3).

While in transit to Westport, Mullin opened the engine compartments and heard pinging coming from the port side engine. (Docket Entry # 56-2, pp. 7-8).   Mullin called defendant and spoke with Dan Jacinto, who instructed him to shut down the new engine.   (Docket Entry # 56-2, p. 8) (Docket Entry # 56-4, p. 3, ¶¶ 29-32).   When he shut down the engine, "the [V]essel lurched to starboard," throwing both Mullin and Keith "to the starboard side of the [V]eseel."   (Docket Entry # 56-4, p. 3, ¶¶ 33-34). Mullin then checked the engine room and was "stunned to find" that all the water "had exceeded the height of the transmissions."   (Docket Entry 56-4, p. 3, ¶ 37).   When the Vessel "was on plane," "the water that infiltrated [the] [V]essel collected at the stern where no bilge pump was located."   (Docket Entry # 56-4, p. 3, ¶¶ 38-40).

Mullin issued a Mayday call to the Coast Guard, which asked him to "beach [the] [V]essel on Westport Town Beach."   (Docket Entry # 56-4, pp. 3-4, ¶ 43-44).   Mullin "felt that this was not a good course of action as [he] had a full tank of fuel and []

was concerned about an environmental impact." (Docket Entry # 56-4, p. 4, ¶ 44). As the Vessel was escorted into the Westport Harbor by the harbormaster, "the Coast Guard called Tripp's Marina and instructed Tripp's to board [the] [V]essel and attempt to find the cause of the water infiltration." (Docket Entry # 56-4, pp. 3-4, ¶¶ 42, 45). At Tripp's Marina, an employee went into the Vessel's engine room and found "a plug that was supposed to be fastened to a riser on the manifold." (Docket Entry # 56-4, p. 4, ¶ 47). The employee indicated that, when the engine was running, "water [was] coming out of the riser where the plug was supposed to be secured." (Docket Entry # 56-4, p. 4, ¶ 47).

## DISCUSSION

The amended complaint brings three counts: negligence, breach of contract, and breach of the implied warranty of workmanlike performance. (Docket Entry # 16-1, pp. 2-3). Defendant moves for summary judgment on the basis that plaintiff has not designated any expert witnesses and does not intend to depose defendant's two purported experts, Michael Collyer and Dan Jacinto.[3] (Docket Entry # 49, p. 1). Without expert testimony, defendant argues, plaintiffs cannot: 1) "account for

---

[3] At a status conference this court held on May 18, 2021, plaintiffs indicated that they had not taken any depositions and did not anticipate doing so. (Docket Entry # 48).

the volume of water that accumulated in the hull of the Vessel;" 2) "rule out that water entered the hull from a source not attributable to [defendant];" or 3) "show that the water present in the hull was a substantial cause of the injuries that are alleged on behalf of [] plaintiffs."  (Docket Entry # 49, p. 1). Defendant concludes that this entitles it to judgment as a matter of law.  (Docket Entry # 49, p. 1).

Plaintiffs oppose the motion, arguing that: 1) expert testimony is not required for this case (Docket Entry # 54, pp. 6-8); 2) plaintiffs have proven causation for the injuries sustained (Docket Entry # 54, pp. 8-9); 3) defendant cannot claim prejudice on the basis that plaintiffs "did not allow [defendant] to inspect the [V]essel after the incident," because defendant failed to respond to both a demand and claim letter for nearly a year (Docket Entry # 54, pp. 10-11); and 4) it is likely that one or more of defendant's designated experts "would be disqualified pursuant to a *Daubert* challenge" because of their reports, expertise, and qualifications (Docket Entry # 54, pp. 11-12).

A. <u>Applicable Law</u>

The preliminary issue before this court is whether federal admiralty law or state law applies to the parties' dispute.[4]  "A

---

[4]  The parties have each referenced a written contract governing defendant's repair of the Vessel.  See (Docket Entry # 16-1, p.

federal court sitting in admiralty must apply federal (rather than state) choice of law rules." Great Lakes Ins. SE v. Andersson, No. 4:20-40020-TSH, 2021 WL 2542489, at *3 (D. Mass. June 21, 2021).  "[I]n determining whether federal admiralty law or [] state law is applicable to the current dispute, [courts] consider as a threshold matter whether federal admiralty law contains an established, applicable rule." Certain Underwriters at Lloyds, London v. Inlet Fisheries Inc., 518 F.3d 645, 650 (9th Cir. 2008); see also Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 314 (1955) (directing courts to first look at federal admiralty law and then state law in interpreting marine insurance policies); Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d 882, 886 (5th Cir. 1991) ("Although the courts typically rely upon federal common law to resolve maritime disputes, state law occasionally can be used to supplement or even supersede maritime law.").  While "state law may 'supplement' federal maritime law," state law "may not directly contradict it." Southworth Mach. Co. v. F/V COREY PRIDE, 994 F.2d 37, 41 (1st Cir. 1993).

---

3) (Docket Entry # 17, p. 3).  Since the inception of this action, however, neither party has provided this court with a copy of the contract, summarized any of its terms, or indicated whether it includes a clause on the applicable law in an action arising from the contract.  This court therefore infers that there is no applicable choice-of-law provision in the contract governing this dispute.

There are "three potential sources of liability under federal maritime law for a ship repairer's infelicitous work": "liability via expressly assumed contractual obligations, the maritime tort of negligence, and the 'implied warranty of workmanlike performance . . . .'" Fairest-Knight v. Marine World Distributors, Inc., 652 F.3d 94, 98 (1st Cir. 2011); see also Southworth, 994 F.2d at 42 (explaining that a "breach of [] express warranty for parts and workmanship incident to the repair of a ship" is "a standard contractual breach to which maritime law has always applied"); La Esperanza de P.R., Inc. v. Pérez y Cía. de P.R., 124 F.3d 10, 16 (1st Cir. 1997) ("[C]ontracts for repairs to a vessel . . . come under the scope of admiralty jurisdiction.").

Here, plaintiffs assert admiralty jurisdiction and allege negligence, breach of contract, and breach of the implied warranty of workmanlike performance in connection with defendant's repair of the Vessel. See (Docket Entry # 16-1, pp. 1-3).[5] Accordingly, this court will apply admiralty law in evaluating the parties' claims.

B. Proof of Causation

"[N]egligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law."

---

[5] Defendant does not dispute that admiralty jurisdiction applies. See (Docket Entry # 17, p. 1).

11

Pariseau v. Capt. John Boats, Inc., No. CIV.A. 09-10624-JGD, 2012 WL 527652, at *14 (D. Mass. Feb. 16, 2012) (quoting La Esperanza, 124 F.3d at 16) (internal quotation marks omitted). As such, the allegedly negligent conduct "must be measured 'by the standards of maritime law' rather than those of state common law."  Pariseau, 2012 WL 527652, at *14 (quoting Kermarec v. Compagnie Generale Transatlantique, 358 U.S. 625, 628 (1959)).

"[T]o establish negligence under general maritime law, the plaintiff must '"demonstrate [inter alia] . . . a *causal connection* between the defendant's conduct and the plaintiff's injury."'"  Pariseau, 2012 WL 527652, at *14 (emphasis added) (quoting Evans v. Nantucket Cmty. Sailing, Inc., 582 F. Supp. 2d 121, 137 (D. Mass. 2008)) (citation omitted).  The plaintiff must make such showing "by a preponderance of the evidence." Pariseau, 2012 WL 527652, at *14.  To satisfy the causation element, "the plaintiff must prove that the defendant's negligence was not only a '"but-for cause"' of the plaintiff's injuries, but also '"a contributory and proximate cause"' of those injuries."  Id. (quoting Evans, 582 F. Supp. 2d at 144) (citation omitted).

The causation principles in maritime tort law also apply to harm resulting from a breach of contract and a breach of the implied warranty of workmanlike performance.  See Tidewater Marine, Inc. v. Sanco Int'l, Inc., 113 F. Supp. 2d 987, 999

12

(E.D. La. 2000) (breach of contract) (citing Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 839 (1996)); Fairest-Knight, 652 F.3d at 99, 103 (breach of implied warranty of workmanlike performance).

Thus, in an action for negligence, breach of contract, and/or breach of the implied warranty of workmanlike performance, the plaintiff must prove that the defendant caused the resulting harm by a preponderance of the evidence. See Pariseau, 2012 WL 527652, at *14; Fairest-Knight, 652 F.3d at 99, 103; Tidewater Marine, 113 F. Supp. 2d at 999. Courts cannot simply "hold that once a shipyard has undertaken to repair a boat, any subsequent breakdowns or problems, without more, be presumed to have been caused by the shipyard."[6] Fairest-Knight, 652 F.3d at 100.

Here, according to plaintiffs, the "causal connection in this matter is as follows":

---

[6] "Although circumstantial evidence may in some cases be used to establish causation, the circumstances must nevertheless allow for a 'strong inference[]' of causation." Fairest-Knight, 652 F.3d at 101 (quoting Marquette Transportation Co., Inc. v. La. Mach. Co., Inc., 367 F.3d 398, 402 (5th Cir. 2004)). "Exclusivity of control or possession is an important factor" to support "this inference." Fairest-Knight, 652 F.3d at 101 (citing N. Ins. Co. of N.Y. v. Point Judith Marina, LLC, 579 F.3d 61, 69-70 (1st Cir. 2009) (finding that no presumption of fault applied because defendant marina did not have exclusive possession of vessel)). Here, plaintiffs do not make such an argument.

13

> Bayline conducted work on Mr[.] Mullin's vessel which included exhaust risers and then completed a one-hour sea trial. Bayline then installed a lower set of exhaust risers. Bayline did not conduct a sea trial after the new exhaust risers were installed. On both the first set and second set of exhaust risers is a plug that needs to be torqued. Bayline does not know if or to what specification the plug was torqued. Approximately one hour (the same amount of time as the only sea trial) after leaving Bayline in his boat, the boat felt sluggish. He was instructed by Bayline to shut down the new engine. When Mr. Mullin shut down the engine, the boat veered toward starboard throwing both Mr. Mullin and Mr. Keith into the wall. After arrival in Westport, MA, the riser plug was found in the bilge. Based on videos produced by Bayline, water infiltrates through the hole left by the missing riser plug. Based on video and his calculations, alleged expert Jacinto opines that it would accumulate 240 gallons of water through the plug hole every hour. 240 gallons of seawater adds approximately 2054 pounds to the vessel (one gallon of seawater weighs 8.56 pounds). This amount of weight would certainly make the vessel sluggish and hard to handle.

(Docket Entry # 54, p. 9). This recitation of facts, without more, is insufficient to show by a preponderance of the evidence that defendant caused the Vessel's operational issues. See Pariseau, 2012 WL 527652, at *14; Evans, 582 F. Supp. 2d at 144; Fairest-Knight, 652 F.3d at 99, 103.

Plaintiffs have not introduced any evidence, for example, that defendant "employed improper repair procedures or used sub-standard parts, nor is there any evidence that . . . that it was poor work by [defendant] rather than poor design, poor manufacture, poor maintenance or abuse by" another that caused the Vessel's issues. See Fairest-Knight, 652 F.3d at 101. It

14

is also unclear to what extent poor weather conditions that day contributed to the Vessel's issues.  Ultimately, plaintiffs have not introduced sufficient evidence showing that defendant's actions caused water to infiltrate the hull of the Vessel, or that such infiltration caused the Vessel to veer starboard and precipitated the Vessel's constructive loss.

    C.    <u>Necessity of Expert Testimony</u>

Plaintiffs have also not introduced any expert testimony as to causation of the Vessel's operational issues, arguing that expert testimony is not required to prove causation under the present facts.  <u>See</u> (Docket Entry # 54, pp. 7-8).  For the following reasons, this court disagrees.

Rule 702 of the Federal Rules of Evidence provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."  Fed. R. Civ. P. 702.

Expert testimony is required in maritime cases unless "'all the primary facts can be accurately and intelligently described to the [j]ury, and if they, as [people] of common understanding are as capable of comprehending the primary facts and of drawing correct conclusions from them as are witnesses possessed of special or peculiar experience or observation in respect to the

15

subject under investigation.'"  Saudi v. S/T MARINE ATLANTIC, No. H-99-CV-2367, 2000 WL 33993435, at *3 (S.D. Tex. Dec. 15, 2000) (quoting Wilburn, 139 F.3d at 359); see Salem v. United States Lines Co., 370 U.S. 31, 35 (1962).  "Where, however, the nexus between the injury and the alleged cause would not be obvious to the lay juror, '[e]xpert evidence is often required to establish the causal connection . . . .'"  Wills v. Amerada Hess Corp., 379 F.3d 32, 46 (2d Cir. 2004) (quoting Moody v. Maine Cent. R.R. Co., 823 F.2d 693, 695 (1st Cir. 1987)).

When plaintiffs must demonstrate that a reasonable jury could find by a preponderance of the evidence that the defendants' repairs or service to a vessel actually and proximately caused plaintiffs' harm, expert testimony is often involved in such disputes.  See, e.g., N. Ins. Co. of N.Y. v. Albin Mfg., No. C.A. 06-190-S, 2008 WL 3285852, at *4 (D.R.I. Aug. 8, 2008) (evaluating expert testimony as to cause of vessel's sinking in action for breach of contract, breach of warranty of workmanlike performance, and negligence), aff'd sub nom. Point Judith Marina, 579 F.3d; Garner v. Cities Serv. Tankers Corp., 456 F.2d 476, 481 (5th Cir. 1972) (evaluating expert testimony as to cause of explosion of hot water heater aboard vessel); Matter of Parry, No. CV 15-10686-LTS, 2018 WL 3150218, at *9 (D. Mass. June 27, 2018) (evaluating expert testimony as to cause of vessel's explosion); FSS, Inc. v. W-

16

Class Yacht Co., LLC, No. 1:16-CV-300-GZS, 2018 WL 953337, at *1, n.1, 15-16 (D. Me. Feb. 20, 2018) (evaluating expert testimony as to cause of vessel's operational issues following defendant's repair).

Based on the facts in this case, examined in the light most favorable to plaintiffs, it "would not be obvious to the lay juror" that defendant's repairs were the cause of the Vessel's water infiltration and its ultimate constructive loss. See Wills, 379 F.3d at 46; see also Fairest-Knight, 652 F.3d at 100 (explaining that it is not the case that "once a shipyard has undertaken to repair a boat, any subsequent breakdowns or problems, without more, be presumed to have been caused by the shipyard"). The proper operation of the Vessel and whether defendant's repairs to the Vessel hindered such operation are therefore not appropriate issues for consideration by the average lay person. See Smith Marine, Inc. v. Kyle Conti Const., LLC, No. CIV. 11-11537-LTS, 2013 WL 3766554, at *8 (D. Mass. July 15, 2013) ("[L]ay people are not equipped to opine on questions related to the safe operation of fifty-two-foot work barges on a navigable waterway . . . ."); Dougherty v. Haaland, 457 F. Supp. 860, 866 (E.D. Pa. 1978) (finding expert testimony was required on question of safe operation of vessel because it required "fairly specific knowledge" of matters "outside the common knowledge and experience of ordinary persons"). A

17

reasonable jury would not be capable of discerning "'the primary facts'" in this case "'and of drawing correct conclusions from them as'" as would an expert witness.  See Saudi, No. H-99-CV-2367, 2000 WL 33993435, at *3 (quoting Wilburn, 139 F.3d at 359); see Salem, 370 U.S. at 35.  This court therefore agrees that "[t]echnical questions such as . . . the sources of alternative pathways for water to enter the hull of the Vessel, [] the rates of ingress of the water to the hull and the rate of discharge are subjects that require expert testimony . . . ."  See (Docket Entry # 50, p. 5).

Thus, expert testimony is required to establish the causation element in plaintiffs' claims.  See Wills, 379 F.3d at 46; Moody, 823 F.2d at 695.  Because "expert testimony is required to support [plaintiffs'] case" here "and there is an absence of such testimony, summary judgment is appropriate" for defendant.  See Cousins, 2019 WL 11234276, at *1 (citing Flanders, 65 F.3d at 206).

II.  Rule 25(a)(1) Substitution Due to Suggestion of Death

As noted earlier, plaintiffs' counsel filed the suggestion of death as to Keith on April 1, 2021, pursuant to Rule 25(a)(1).  (Docket Entry # 22).  Plaintiffs' subsequent filings replaced Andrew Keith in the caption with "Robert Keith as personal representative of the estate of Andrew Keith."  See, e.g., (Docket Entry # 56) (capitalization modified).

Rule 25(a)(1) provides that "[i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party.  A motion for substitution may be made by any party or by the decedent's successor or representative."[7]  Fed. R. Civ. P. 25(a)(1).  However, "[i]f the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed."[8]  Fed. R. Civ. P. 25(a)(1).  If a motion is filed more than 90 days from service of the statement of death, it is subject to Fed. R. Civ. P. 6(b) and therefore requires a showing of "good cause."  Fed. R. Civ. P. 25 advisory committee's note to 1993 amendment; Fed. R. Civ. P. 6(b)(1).

This court was notified of Keith's death in April 2020 but it is unclear whether his representative or successor (Robert

---

[7]  Although a "decedent's lawyer may not file" a Rule 25 motion to substitute "in his own name because he no longer has a client, . . . he is permitted to file a motion for an extension of time if there is no executor because the decedent died without a will and an administrator of the estate has not yet been named."  Atkins v. City of Chicago, 547 F.3d 869, 872 (7th Cir. 2008); see Unicorn Tales, Inc. v. Banerjee, 138 F.3d 467, 470 (2d Cir. 1998).

[8]  "While courts have interpreted this aspect of Rule 25 in various ways, 'six circuits have held that the limitations period in [Rule] 25(a)(1) does not begin until the decedent's representative or successor is properly served with the statement noting death.'"  Boniface v. Viliena, 338 F. Supp. 3d 50, 71 (D. Mass. 2018) (quoting In re C.R. Stone Concrete Contractors, Inc., 462 B.R. 6, 19 (Bankr. D. Mass. 2011)).

Keith or otherwise) has been appointed and properly served with the statement noting Keith's death. Since then, no motion for substitution has been filed, and plaintiffs' counsel has not requested an extension of time to file such motion.

Accordingly, this court will provide the parties two weeks (no later than December 21, 2021) to advise this court whether a representative or successor has been appointed and properly served and, if so, set out their positions or agreement on the substitution of that representative or successor for Keith. The parties should note that this is not an opportunity to proffer additional arguments regarding summary judgment or to expand the record on the merits of summary judgment as to Keith.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Docket Entry # 49) is **ALLOWED** as to Mullin and **HELD IN ABEYANCE** as to Keith until December 21, 2021.

                                              /s/ Marianne B. Bowler
                                              **MARIANNE B. BOWLER**
                                              United States Magistrate Judge